IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID MCMULLEN,<br><br>Plaintiff,<br><br>v.<br><br>PEERSTAR LLC,<br><br>Defendant. | CIVIL ACTION NO. |

**COMPLAINT**

Plaintiff David McMullen files this Complaint against Defendant Peerstar LLC ("Peerstar"), seeking relief from Peerstar's violations of the False Claims Act ("FCA" – 31 U.S.C. §§ 3729-3733) and the Pennsylvania Whistleblower Law ("WBL" – 43 P.S.§§ 1421 *et seq*.), and in support states the following:

**PRELIMINARY STATEMENT**

1. Peerstar markets itself as a pioneering behavioral health organization which provides peer support services to individuals living with mental health and recovery challenges. Peerstar believes that through its support services model, it can help people move toward wellness, independence, and lasting recovery.

2. McMullen worked at Peerstar on two occasions, from 2013-2016 and in 2026, and this last stint was dramatically different as Peerstar had remade itself into an organization whose primary concern and focus was to bill more and more hours even when it might not benefit its patients.

3. McMullen began reporting his concerns about whether Peerstar's patient care, documentation, and patient billing practices were legal. As McMullen grew increasingly frustrated with Peerstar's refusal to address his concerns, his employment was terminated.

4. McMullen is the third in a group of former Peerstar employees who is seeking relief after they were fired for reporting waste, wrongdoing, and fraud within Peerstar's day-to-day operations and Medicaid billing practices.

5. McMullen is initiating this matter pursuant to the FCA and WBL, to address the retaliatory actions undertaken by Peerstar after he reported issues of waste, wrongdoing, and fraud by Peerstar.

## THE PARTIES

6. Plaintiff David McMullen is an adult individual who resides in Ruffs Dale, Pennsylvania.

7. Defendant Peerstar is a corporation organized under Pennsylvania law with headquarters located at 400 Lakemont Park Blvd, Suite 300, Altoona, Pennsylvania 16602

8. At all relevant times, Peerstar acted by and through its authorized agents, servants, workmen, and/or employees, who were acting within the course and scope of their employment with Peerstar and in furtherance of Peerstar's business.

9. At all relevant times, Peerstar is and has been an "employer" and/or "federal contractor" as defined under the FCA and is accordingly subject to the provisions of the FCA.

10. At all relevant times, Peerstar is and has been an "employer" and "agent of a public body" within the meaning of the WBL in that it receives Medicaid funding from the Commonwealth of Pennsylvania and is accordingly subject to the provisions of the WBL.

11. At all relevant times, McMullen was an "employee" of Peerstar as defined under the FCA and WBL and was entitled to the protection of the provisions of each said Act.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that the claims of McMullen arise under the laws of the United States and McMullen is seeking redress for violations of federal laws. The Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367, because such claims are so closely related to McMullen's federal claims that they form part of the same case or controversy

13. Venue is proper in this district pursuant to 28 U.S.C. § 1391, as a substantial part of the events and omissions giving rise to this action occurred within the Western District of Pennsylvania at facilities located in Allegheny County and Westmoreland County.

## FACTUAL BACKGROUND

A. Peerstar and its Peer Support Business Model

14. Peerstar's business model relies on the premise that individuals who are struggling with their mental health and/or substance abuse recovery benefit from peer support or being around people who have previously struggled with those issues.

15. Peerstar describes the peer support system it provides patients as goal-based, structured and purposeful; provided by trained peer specialists with lived experience; flexible (at home, in the community, or via telehealth); covered by Medicaid at no cost to you; and built on genuine connection and understanding. See Peerstar's About Section at https://www.peerstarllc.com/about. (last accessed on November 12, 2026).

16. To support its business model, Peerstar hires individuals to work as Certified Peer Support Specialists ("CPS") and Certified Recovery Specialists ("CRS").

17. The CPS position is critical to Peerstar's business model as the company states that it "exists for the spaces and situations in between – the gaps clinical care can't always

reach." See Peerstar's About Section at https://www.peerstarllc.com/about. (last accessed on November 12, 2026).

18. In a 2026 job posting for the CPS position, Peerstar describes the job duties for its CPS employees in the following way:

a. Inspire hope in individuals through community-based 1:1 peer support.

b. Your job is designed to promote empowerment and self-determination.

c. Building trust through your lived experience and offering tools to help others achieve growth.

19. CPS employees are not required to have any background or experience with providing mental health and/or substance abuse recovery services to others before working at Peerstar. Instead, Peerstar only requires the following qualifications for its CPS employees

a. Must be able to attest to having a mental health diagnosis and have reached a point in their recovery pathway where they can positively support others in similar situations.

b. Eighteen (18) years of age and older.

c. Must have maintained 6 months of consecutive employment or volunteer work experience; OR within the last three (3) years, have maintained at least 12 months of successful full or part-time paid or volunteer work experience.

d. Must be able to participate in a two-week course to receive state-issued certification or possess a PCB state-issued CPS certification.

e. Ability to use iPad for documentation.

f. Must have a driver's license and reliable transportation.

B. <u>Peerstar's Medicaid-Funded Services and Billing Practices</u>

20. Peerstar states that its peer support services are fully funded by Medicaid and individuals with Medical Assistance (MA) coverage in Pennsylvania and a qualifying mental

health diagnosis pay nothing for Peerstar's services. See Peerstar's How It Works Section at https://www.peerstarllc.com/how-it-works. (last accessed on October 28, 2026).

21. The type of peer support services Peerstar provides a patient is contained within that patient's individual recovery plan ("IRP").

22. A patient's IRP is created by a team of Peerstar's supervisory-level employees ("Peerstar Program Manager"), and the IRP will include how many hours a patient needs to spend with a CPS employee each week.

23. State regulations determine the maximum number of hours a Peerstar patient can receive. In addition, Peerstar's Program Managers determine the number of hours a patient receives per focus area by using the Adult Needs and Strengths Assessment ("ANSA") and other clinical tools.

24. In theory, Peerstar should be determining the number of hours a patient receives by reviewing the ANSA, information provided by CPS employees, and repeated assessments of the patient's needs. For example, if a CPS employee informs a Program Manager that a patient's medication is making them too drowsy to receive the number of hours in the IRP, then the Program Manager should make downward adjustments in the IRP plan based on those CPS employee's observations.

25. In practice, Peerstar's Program Managers rarely accounted for or incorporated the information CPS employees provide about patients when creating or modifying a patient's IRP.

26. Upon information and belief, Peerstar determined that it was not profitable to assign their patients less than 5 hours of services per week. As a result, Peerstar provided its Program Managers with full authority to assign a minimum number of hours a patient receives

with a CPS employee even if that recommendation deviated from the ANSA, other clinical resources, or the patient's wishes.

C. McMullen's Reporting of Peerstar's Illegal Conduct

27. McMullen worked for Peerstar as a CPS employee from 2013 through 2016. During that three-year period, McMullen performed the essential functions of his job, and he performed them so well that he was promoted to a supervisory-level position.

28. When McMullen returned to Peerstar on June 15, 2026, he was hired as a Certified Peer Specialist Supervisor SLS ("CPS Supervisor").

29. As a CPS Supervisor, McMullen immediately noticed differences in how Peerstar previously operated. Eventually, McMullen realized the differences were not simply because of changes in systems or processes, but rather, a significant departure in how Peerstar viewed, interacted with, and treated their patients.

30. A few weeks after McMullen began his second stint with Peerstar, he was providing services to an elderly patient ("Patient 1") who indicated that they no longer wanted services from Peerstar. McMullen told Peerstar's Regional Director, Kristin Steineger, about this incident. In response, Steineger told McMullen to disregard what Patient 1 stated and to approve them for services by completing the IRP in a specific way.

31. Soon after, McMullen was completing an IRP for another patient ("Patient 2"). During this IRP session, McMullen determined that Patient 2 did not qualify for services through Peerstar. McMullen reported this meeting with Patient 2 to Steineger, who dismissed McMullen's concerns. Steineger told McMullen that Patient 2 "qualified for services originally" and strongly implied that McMullen should change the IRP to reflect that. When McMullen

refused, because he believed it would be fraudulent, another Peerstar supervisor told McMullen that he did not need to submit the IRP for Patient 2.

32. On July 8, 2026, McMullen was working on an IRP with another elderly patient ("Patient 3") who specifically stated that they did not want any services. McMullen reported this interaction to Steineger. Steineger, again, told McMullen to disregard what Patient 3 stated. McMullen pushed back and told Steineger that he believed Peerstar was taking advantage of Patient 3. In addition, McMullen told Steineger that he believed Peerstar was forcing its services onto patients who did not want them and that Peerstar was specifically taking advantage of its elderly patients.

33. On July 9, 2026, McMullen reviewed his work schedule and saw that Peerstar had removed four patients from his schedule.

34. On July 10, 2026, McMullen was in a training session with an IRP Specialist Supervisor. During that training session, the IRP Specialist Supervisor told McMullen that he needed to increase the number of hours he was providing to a patient ("Patient 4"). Specifically, the IRP Specialist Supervisor indicated to McMullen that the IRP needed to be completed in a specific way so that Peerstar could justify a higher number of patient hours per week. When reviewing an IRP McMullen, completed, the IRP Specialist Supervisor said that four hours of services per week was too low and that Peerstar was trying to push 8 to 15 hours of services onto patients per week so that each CPS employee could have enough work. When McMullen tried to push back and explain that the patient in question did not want more service hours, the IRP Specialist Supervisor reiterated that four hours of services per week was too low.

35. On July 13, 2026, Peerstar terminated McMullen's employment.

## STATEMENT OF CLAIMS

**COUNT I**
Violations of the FCA - 31 U.S.C. § 3730(h)
(Plaintiff v. Defendant)

36. McMullen incorporates by reference the allegations in Paragraphs 1 through 35, as if fully set forth herein.

37. By the actions described above, among others, Peerstar retaliated against McMullen by terminating his employment days after he reported Peerstar's practice of targeting elderly and vulnerable patients, changing the answers on those patients' IRPs to justify a higher number of service hours, and then billing Medicaid for those services, in violation of the FCA. 31 U.S.C. §3730(h).

38. As a direct and proximate result of the Peerstar's unlawful conduct in violation of the FCA, McMullen has suffered, and continues to suffer, economic injury, harm to his reputation, humiliation, embarrassment, mental anguish, emotional distress, discomfort, and/or other injuries and irreparable harm for which he is entitled to an award of monetary damages, special damages, and other relief.

**COUNT II**
Violations of the WBL
(Plaintiff v. Defendant)

39. McMullen incorporates by reference the allegations in Paragraphs 1 through 38, as if fully set forth herein.

40. By the actions described above, among others, Peerstar retaliated against McMullen by terminating his employment days after he reported Peerstar's practice of targeting elderly and vulnerable patients, changing the answers on those patients' IRPs to justify a higher

number of service hours, and then billing Medicaid for those services, in violation of the FCA. 31 U.S.C. §3730(h).

41. As a direct and proximate result of the Peerstar's unlawful conduct in violation of the WBL, McMullen has suffered, and continues to suffer, economic injury, harm to his reputation, humiliation, embarrassment, mental anguish, emotional distress, discomfort, and/or other injuries and irreparable harm for which he is entitled to an award of monetary damages, special damages, and other relief.

## REQUESTS FOR RELIEF

Accordingly, McMullen requests that this Court enter judgment on her behalf and enter an order directing the award of other relief, as follows:

A. Finding that Peerstar violated the FCA;

B. Finding that Peerstar violated the WBL;

C. Awarding McMullen back pay, lost benefits, and other emoluments of employment and such other relief as is necessary to make him whole;

D. Awarding McMullen double back pay damages pursuant to the FCA:

E. Awarding McMullen compensatory damages;

F. Awarding McMullen special damages;

G. Awarding McMullen attorneys' fees and costs;

H. Awarding McMullen pre- and post-judgment interest as provided by law;

I. Injunctive relief and such other and further equitable relief as the Court deems necessary and proper; and

J. Awarding McMullen any other relief to which he is entitled and/or which this Court deems necessary and proper.

**A jury trial is demanded for all claims triable by jury.**

Respectfully submitted,

/s/ Sammy Sugiura

Sammy Y. Sugiura
PA ID No. 209942
Greenberg Gross LLP
1650 Market Street, Suite 3600,
Philadelphia, PA 19103
SSugiura@GGTrialLaw.com

**Counsel for Plaintiff**